UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
CULTURAL ASSETS 1, LLC,
a New Mexico Domestic
Limited Liability Company,
    Debtor(s).                        No. 11-12-13793-s11

**MEMORANDUM OPINION AND ORDER**
**GRANTING EMERGENCY MOTION FOR STAY RELIEF AND**
**ORDERING THAT RULE 4001(a)(3) STAY WILL NOT BE IN EFFECT**

Michael and Kay Coughlins' Emergency Motion for Relief from Automatic Stay (doc 6) ("Motion") came before the Court for a final, non-emergency evidentiary hearing on December 10-11, 2012. The Motion seeks permission to exercise non-bankruptcy law remedies against the debtor in possession Cultural Assets 1, LLC ("Cultural Assets") including selling the residence at 21 Painted Horse, Las Campanas, Santa Fe, New Mexico ("Property"), enforcing state-court ordered injunctive relief, a return to the First Judicial District Court, County of Santa Fe, State of New Mexico ("State Court") to pursue the merits of two State Court actions, and a ruling that the Rule 4001(a)(3) F.R.B.P. stay will not be in effect. Relief is sought under both §§ 362(d)(1) and (d)(2). Debtor has responded (doc 14) by, inter alia, offering adequate protection and filing a motion to assume a lease of the Property (doc 41).

For the reasons set out herein, the Court will enter an

Page 1 of  23

order granting the Motion.[1]

**Background**

The business of Cultural Assets under its manager Mr. Al Luckett was and is to perform "due diligence services" (Debtor's phrase) on art and artifacts that belong to other persons or entities. The idea behind Cultural Assets is to establish "absolute proofs" (Mr. Luckett's term) of the authenticity and provenance of collected items so that there are no reasonable concerns about ownership of the art and artifacts so that in turn they can be freely sold at their maximum price (or, alternatively, retained by the owner or donated). Following the completion of the research to establish the absolute proofs, some combination of Cultural Assets and/or the owners of the art and artifacts will bring an action against the United States Department of Justice to obtain a declaratory judgment to establish the authenticity and provenance of the items, thereby completing the process of making them more saleable at a higher price. The declaratory judgment action was supposed to have been initiated sometime this summer or fall but has not been because Mr. Luckett has been preoccupied with dealing with the lease and occupancy issues concerning the Property.

---

[1] The Court has subject matter and personal jurisdiction pursuant to 28 U.S.C. §§1334 and 157(b); this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(G); and these are findings of fact and conclusions of law as may be required by Rule 7052 F.R.B.P.

Case 12-13793-trc11    Doc 58    Filed 12/14/12    Entered 12/14/12 12:07:45 Page 2 of 23

Mr. Luckett is described as the operations manager for Cultural Assets. He is the one who formulated Cultural Assets' strategy, directs the activities of Cultural Assets and appears to be the one person doing most of the work. He has working with him a certain Matt Perez, stated to be a former FBI agent with considerable expertise, experience and contacts outside the United States that aid considerably in the research and verification process. Mr. Brian Rowe is the managing member of the LLC and the designated representative of the chapter 11 debtor in possession.

As part of its business, Cultural Assets has custody or temporary possession of about 2,000 items, all belonging to other persons or entities, which require very careful handling and storage. Cultural Assets had possession of many or all of those 2,000 items in 2010.

About five years ago the Coughlins designed (with an architect) and had built for them a residence at 21 Painted Horse in the Las Campanas part of Santa Fe.[2] When the tsunami of the world wide financial crisis and the succeeding national recession finally hit the Santa Fe residential market, including the very

---

[2] From the pictures and witness testimony, it appears the home (including the floor plan, style, finishes and views) is, to put it mildly, simply stunning, constituting the rare sort of property that justifiably draws persons of wealth and sophisticated taste from around the world to purchase second and third homes in Santa Fe.

high-end part of the market, it deeply depressed prices and sales, such that the Coughlins were unable to sell the property for anything near what they needed to get out of it.  In consequence, in the process of attempting to sell the property, they were open to leasing it for some time, until the market recovered enough to permit a sale.

In the spring and summer of 2010, Mr. Luckett and his spouse Ms. Christine McCarthy were looking for a residence for themselves where they could also locate the business of Cultural Assets, including the 2,000 items of art and artifacts. In about July 2010 Mr. Luckett viewed the 21 Painted Horse property with a view to possibly purchasing it, and in the process learned that it could be leased.  His real estate agent Mr. Huitfeldt suggested that he lease the property for a while as a way of deciding whether he might want to purchase it, and this idea made sense to Mr. Luckett in part because he thought that Santa Fe real estate prices would drop further.  As a result, in August 2010 Mr. Luckett on behalf of Cultural Assets as lessee and the Coughlins as lessors signed a lease agreement for the property. Coughlin exhibit 3 (C-3) ("First Lease").  The lease was for one year – September 2010 through August 2011 – at a rate of $4,500 per month.  Cultural Assets was also responsible for the water and sewer bills from the LC water and sewer coop.  And the First Lease had a "furniture addendum" which permitted Cultural Assets

within sixty days to purchase certain furniture of the Coughlins which was part of the staging of the residence for sale.

Having signed the lease, the Coughlins took the property off the active sales market.  The listing was not activated again for a sale until April 2012.

Over the course of the First Lease, Cultural Assets was consistently late in paying the monthly rent.  It was also consistently late in paying the Las Campanas water and sewer bills.  The Court finds that the continuing tardiness of payments was not due to lack of notice or knowledge of the payment obligations, but rather from Cultural Assets' lack of funds.

With the high-end real estate market still very depressed and despite the history of late payments, the same parties signed another year's lease in September 2011 for September 2011 through August 2012 ("Second Lease").  Coughlins entered into the Second Lease despite the problems with the First Lease because their monthly payments for the Property – mortgage, taxes, insurance, home owner association dues, and landscaping – totaled $9,155 per month.  The Coughlins calculated that some income from the Property was better than none.

In view of the history of late payments, the rent was set at $5,000 per month for September and October 2011 and at $5,500 per month for the remaining months.  The $5,500 figure was fixed and not contingent or reducible for any reason (despite the testimony

Case 12-13793-trc11   Doc 58   Filed 12/14/12   Entered 12/14/12 12:07:45 Page 5 of 23

presented by and position taken by Cultural Assets and despite Cultural Assets' having paid rent at the rate of $4,500 per month post petition).  The furniture addendum was changed to provide an inducement to correct the late payment problem -- if all the monthly payments required by the lease were made, and made timely, Cultural Assets could have the furniture (with the exception of some rugs) without further charge.  Cultural Assets continued to be liable for paying the water and sewer bills.  And the Second Lease contained a provision for an automatic month to month tenancy at the end of the 12-month term unless and until either party gave a 30-day notice of no further occupancy.

In April 2012 the sales listing was reactivated, and it resulted in an offer and acceptance in the July-September 2012 time period of a deal whereby two mutually contingent sale contracts were executed between the Coughlins and another owner of property in Las Companas, whereby Coughlins and the other party agreed to purchase each others' properties in Las Campanas. The closing of these mutual transactions was supposed to take place no later than October 31, 2012.  In connection with this sale, the Court finds as facts (and concludes as to any legal questions) that neither Cultural Assets nor Mr. Luckett nor any other person or entity connected with Cultural Assets had an option to purchase the Property, and also finds and concludes that even if there were such an option, neither Cultural Assets

nor Mr. Luckett exercised such an option.  One consequence of these facts is that there was nothing to prevent Coughlins from entering into a contract to sell the Property to the buyer on any terms whatever.

Cultural Assets continued to make its rent payments and water and sewer payments both sporadically and late, as was the situation from the start of the First Lease.  Mr. Nowlin, the person in charge of water and sewer billing for Las Campanas, testified matter of factly how cavalier, even dismissive, Mr. Luckett was when he was contacted for payment and in response told Mr. Nowlin that the bills would be paid when he (Mr. Luckett) got paid.[3]  The Court senses from testimony and documents that this was the same attitude from Mr. Luckett, albeit toned down somewhat, when he was dealing with the Coughlins as they attempted to collect past due rent.

When the Second Lease expired[4] at the end of August 2012, Cultural Assets continued in possession on a month to month tenancy, as provided by the terms of the Second Lease.  Coughlins

---

[3] The Court finds that Mr. Nowlin was completely credible, as were Messrs Maestas, Herdman, Coughlin, Wilson, Collins, Huitfeldt, and McDonald, and Ms. Coughlin.  Some of the witnesses appear to have gotten minor details in their testimony incorrect, but the Court is comfortable that each of the named witnesses was trying to be as accurate and forthcoming as possible.

[4]  In its schedule G and amended schedule G (docs 9 and 27 respectively), the Debtor has consistently, and accurately, listed the Second Lease as "expired".

with their counsel Frank Herdman delivered a three-day notice of nonpayment of rent on September 25 together with notice sufficient in any event to end the month to month tenancy of Cultural Assets effective no later than October 31, 2012.[5]  C-8. Because the chapter 11 petition was filed on October 16, Cultural Assets remains in the premises.

In preparing for the sale, Coughlins sought access to the Property, including the interior of the house, for their agents. The requests or demands for such access were permitted by the terms of the lease, Second Lease ¶ 14, and after the filing of the petition did not constitute a violation of the automatic stay.  Cultural Assets through Mr. Luckett unreasonably refused that access, both before and after the filing of the petition, in violation of the terms of the Second Lease, requiring Coughlins to obtain relief from both the State Court and this Court.[6]  It was in this context that Coughlins filed their motion for stay relief on an emergency basis three days after the filing of the petition, on October 19, in order to keep the sale process moving

---

[5] Because the ultimate adjudication of all these issues will have to be made by the State Court, these findings and conclusions are in a sense preliminary but required for a ruling on the stay motion.

[6] The two pending State Court actions are styled and numbered Coughlin v. Cultural Assets 1, LLC, D-101-CV-2012-2707 (restitution action) (complaint - C-10) and Coughlin v. Cultural Assets 1, LLC, D-101-CV-2012-2764 (injunctive action, to permit access to and inspection of the Property) (complaint - C-11).

forward.  Doc 6.  That action resulted in an emergency
preliminary hearing on October 23 (minutes – doc 16) and a
preliminary order from this Court the same day (doc 17) requiring
access for the Coughlins and their agents.  But whether because
of the actions of Mr. Luckett or for other reasons, the buyer
exercised his right to back out of the sale, and so on October 24
Coughlins filed a supplement to the motion informing the Court
and parties of that fact.  Doc 18.  In consequence, following
notice to the creditor body and expedited discovery, the final
hearing took place on December 10 and 11, 2012.  Doc 56
(minutes).

**Analysis**

Section 362(d) provides in relevant part:

On request of a party in interest and after notice and
a hearing, the court shall grant relief from the stay
provided under subsection (a) of this section, such as
by terminating, annulling, modifying, or conditioning
such stay--
(1) for cause, including the lack of adequate protection of
    an interest in property of such party in interest;
(2) with respect to a stay of an act against property under
    subsection (a) of this section, if--
    (A) the debtor does not have an equity in such
        property; and
    (B) such property is not necessary to an effective
        reorganization; . . . .

And §362(g) provides as follows:

In any hearing under subsection (d) or (e) of this
section concerning relief from the stay of any act
under subsection (a) of this section--
(1) the party requesting such relief has the burden of proof
    on the issue of the debtor's equity in property; and
(2) the party opposing such relief has the burden of proof

Page 9 of  23

on all other issues.

For their grounds under subsection (d)(1), Coughlins essentially argue that the right to a month to month tenancy was terminated before the petition was filed on October 16, 2012 so there is neither a lease nor a tenancy left to assume, that their interest in the Property is not being adequately protected, and that this is a bad faith filing in any event. Under subsection (d)(2), they argue that there can be no equity in the property under a lease (even putting aside that the lease has expired and the month to month tenancy terminated) and there is no reorganization reasonably in prospect. Debtor argues in large part that it can provide adequate protection such that the stay need not be modified.

The Court agrees with Coughlins' arguments and disagrees that Debtor has shown that it can and will provide adequate protection, except that the Court need not, and therefore does not, rule on the bad faith filing argument.[7]

_____

[7] Stay litigation is by design summary and expedited. <u>See, e.g.,</u> <u>Grella v. Salem Five Cent Sav. Bank</u>, 42 F.3d 26 (1st Cir. 1994):
> Moreover, the hearing on a motion for relief from stay is meant to be a summary proceeding, and the statute requires the bankruptcy court's action to be quick.
<u>Id.</u> at 31, citing <u>In re Vitreous Steel Prods. Co.</u>, 911 F.2d 1223, 1232 (7th Cir. 1990) (chapter 7 trustee not precluded from pursuing preference action against Bank that obtained stay relief to pursue collection on promissory note)].
> The limited grounds set forth in the statutory language, read in the context of the overall scheme of § 362, and combined with the preliminary, summary

Case 12-13793-trc11    Doc 58    Filed 12/14/12    Entered 12/14/12 12:07:45   Page 10 of 23

Importantly, there are two major issues that the parties appear to agree on: first, that Cultural Assets had at least a possessory interest in the Property since it was in possession on the date of the filing of the petition (even though Coughlins were asserting in the State Court proceedings that Cultural Assets no longer had any right under state law to be occupying the premises), thus triggering the need for stay relief should the Coughlins seek to continue the State Court actions against Cultural Assets; and second, that it is permissible (from Cultural Assets' viewpoint) or necessary (Coughlins' viewpoint) to go back to the State Court to get a final ruling on the status of the Second Lease and the tenancy. The Court agrees with both those positions.

---

nature of the relief from stay proceedings, have led most courts to find that such hearings do not involve a full adjudication on the merits of claims, defenses, or counterclaims, but simply a determination as to whether a creditor has a colorable claim to property of the estate.

Id. at 32, citing among other cases In re Quality Elect. Ctrs., Inc., 57 B.R. 288, 290 (Bankr.D.N.M.1986) (relief from stay proceedings limited to whether the moving creditor has a colorable claim to a perfected security interest).

In consequence, a hearing on the alleged bad faith of the chapter 11 filing, even if only made on a preliminary or colorable basis, is best left to another day when the issue can be fully developed and litigated, particularly since the Court does not need to resolve the issue in order to decide the Motion. Indeed, since it appears that the reason this chapter 11 case was filed was to maintain the Debtor in these premises, it may turn out the State Court adjudication of the lease and tenancy issues moots consideration by this Court of the bad faith issue altogether.

Case 12-13793-trc11   Doc 58   Filed 12/14/12   Entered 12/14/12 12:07:45 Page 11 of 23

Based on the evidence and argument, Cultural Assets' only remaining interest in the Property is possessory. The State Court ruling, at least preliminarily, ended Cultural Assets' right to be in the Property. That State Court ruling cannot be revisited by this Court, whether or not there are questions about lack of due process, etc. raised by Cultural Assets. The Rooker-Feldman doctrine [Rooker v. Fidelity Trust Co., 263 U.S. 413, 414-416 (1923) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482(1983)] ordinarily prevents a federal court from acting as an appellate court to review a state court decision. Cf. Exxon Mobil Corp. v. Saudi Basic Indus., 544 U.S. 280, 282-84 (2005). Of course, going back to State Court can resolve those issues.

As to the subsection (d)(2) grounds, the analysis usefully starts with a look at the Debtor. Cultural Assets, when it filed and still now, was and is barely more than a name and a registration with the Public Regulation Commission. It does have articles of organization and a managing member (Mr. Rowe) and owners (Mr. Rowe and Deadend Investments Limited Partnership – see doc 4), but its original and amended schedules and statements of financial affairs (and notices of such) state that it has no cash, no checking or savings accounts, no real estate, $7,510 in personal property ($5,000 security deposit with the Coughlins, $2,000 debt owed by Christine McCarthy, $500 of office furniture,

Case 12-13793-trc11   Doc 58   Filed 12/14/12   Entered 12/14/12 12:07:45 Page 12 of 23

computer, printer and bookshelves, and $10 for a 2002 computer),
no income from any source over the last two years, and no one in
charge of or in possession of any books or records or inventories
of the Debtor.  Docs 9, 27, 31, 50, 51, and 52 collectively.
Other persons and entities pay its bills.[8]  It is a wraith,
barely existing substantively.

Cultural Assets' business plan appears to share some of that
insubstantiality.  As noted above, once Cultural Assets has
completed its research, it intends to use a declaratory action

---

[8] The Debtor's disclosure of compensation signed by the
Behles Law Firm, P.C. (Jennie D. Behles) recites that the firm
has received no compensation, but that the compensation paid and
to be paid to counsel is or will be coming from the Debtor.  No
other source of payment is listed.  Doc 3.  However, the retainer
agreement attached to the compensation disclosure statement
recites that Christine McCarthy and Al Luckett, as agents of
Debtor, agree to guaranty payment of Debtor's obligations to
counsel.  Id.  The amended statement of financial affairs, no. 9,
states that no payments have been made related to debt counseling
or bankruptcy.  Doc 52.  On the other hand, the retainer
agreement attached to the disclosure of compensation states that
an initial refundable retainer of $5,000 plus the filing fee
"must be paid by Client to Attorneys before Attorneys" will
undertake work for the client.  Doc 3.  Counsel's employment
application makes no statement at all about any compensation
having been paid, or any source of compensation other than the
Debtor, nor does it have the retainer agreement attached.  Doc
25.  At the start of the stay hearing the Court addressed aspects
of counsel's employment application (gratuitously, in order to
prevent future problems), but did not address any question about
any other source of compensation for counsel.  The Court raises
the disclosure statement now only for the same reason the Court
earlier addressed the employment application; that is, to avoid
problems in the future that might be remediated now.

under the National Stolen Property Act[9] to preemptively force the Department of Justice to defend (and presumably lose) against the "indisputable proof" of authenticity and provenance for the 2,000 items. Thereafter the commissions or other compensation will begin to roll in as items are sold to universities, museums and other collectors.

Mr. Luckett's confidence in his strategy derives in part from his legal analysis of the arguments made in a United States District Court case in the Eastern District of Missouri[10], in which the trial judge, according to Mr. Luckett, on three different occasions dismissed a forfeiture action filed by the Department of Justice. The Department appealed the dismissals, and then the parties were granted an indefinite stay of the proceedings to negotiate the disposition of the items in question. The arguments presented by the defense in that case provide the basis for Cultural Assets' proposed litigation.

Mr. Luckett provided the Court only with his conclusion that

---

[9] The National Stolen Property Act was enacted on May 22, 1934 (ch. 333), 48 Stat. 794, but subsequently repealed and now has provisions in a revised title: see 18 U.S.C. §§ 10, 2311, 2314 and 2315. Section 2314 provides in part as follows:
> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... [s]hall be fined ... or imprisoned....

[10] No specific citation to this litigation was presented to the Court, nor has the Court found it necessary to find the case.

he would be successful, but not his analysis, the defense arguments he relies on, nor any of the United States District Court rulings.  Nor did Mr. Luckett provide an estimated time frame for the ultimate (favorable) resolution of the Cultural Assets litigation, although he did say, perhaps in a show of confidence, that he is not in a position to litigate these issues for years as has happened (he asserts) in cases the government has brought against purported owners of artifacts from Cambodia and Iran.

Mr. Rowe also testified that he anticipated significant income for Cultural Assets either from commissions or a "participation" in the post-litigation sale of the objects.  However, he did not know whether there were currently contracts that so provided.

Mr. Luckett provided no estimate of the cost of the litigation; Cultural Assets asserts that the owners of the objects will provide that funding.  Indeed, the money needed to complete the research and to run the chapter 11 case in every other way, including paying counsel and continuing to pay other professionals as needed, such as Mr. Perez, will all have to come from borrowing.  To date in the case, no motions to authorize any borrowing have been filed.

Mr. Luckett testified that he has approached a number of persons or entities about both short term borrowing – $20,000 –

Case 12-13793-trc11    Doc 58    Filed 12/14/12    Entered 12/14/12 12:07:45 Page 15 of 23

and long term borrowing – $250,000 – all on an unsecured basis, to provide adequate protection to Coughlins (and presumably to provide money for operations).  He testified that he was in negotiations with a specific person who had the wherewithal to provide that amount of funding.  As of the date of the hearing there was no deal, including on an interest rate, but the parties were close.  Though repeatedly questioned, Mr. Luckett refused to disclose the identity or any details about the potential lender.

Similarly, Mr. Rowe testified that he too was contacting private lenders and investors for funding on an unsecured basis at a 4% – 6% interest rate.[11]  He expected by the end of the week to have a decision on short term lending – $30,000 to $40,000 – and by the end of the month on long term lending – $200,000 to $300,000.

That Cultural Assets does not have debtor in possession financing lined up – indeed, that it appears only now to be addressing that issue – illustrates either the ephemerality of the business prospects for this case, or a considerable lack of insight about what would happen when this case was filed, or both.  Neither bodes well for the future of this case as a chapter 11 proceeding.  In any event, there is no effective

---

[11] Given the Debtor's lack of assets, any funding would probably have to be unsecured from the Debtor's perspective. There was no testimony about whether co-borrowers or guarantors would be required to put up collateral, or whether there would even be co-borrowers or guarantors.

reorganization that is in prospect for this Debtor.  See United

Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,

484 U.S. 365, 375-76 (1988).

Similarly, as the evidence makes clear and the State Court

has already in effect ruled (albeit preliminarily), all the

Debtor has at this point is in fact no more than a current

possessory interest in the Property.  It has no right to a longer

term lease, and even if successful in the State Court restitution

action (no. 2012-1207), it will at best be able to obtain another

month on the premises.  Mr. Luckett's testimony to the effect

that he and Mr. Coughlin agreed, in late August or early

September 2012, that Cultural Assets could have another year in

the Property is completely unbelievable.  To begin with, Mr.

Luckett essentially conceded that the two of them did not

discuss, much less agree on, critical terms such the amount of

rent.  And the notion that Mr. Coughlin would agree to such a

thing, when he and Ms. Coughlin were entering into a contract to

sell the Property, when the rent was continually late, and when

dealing with Mr. Luckett was so unpleasant, defies logic.  Of

course, no such written agreement was produced.  All this makes

eminently clear that the Debtor has no equity in the Property.

The Court is therefore compelled to rule that Coughlins have

established grounds to modify the stay under §362(d)(2).

As to subsection (d)(1), also from what has been said,

Cultural Assets is unable to offer sufficient adequate protection of Coughlins' interest in the Property to avoid modification of the stay. There is no evidence that Cultural Assets can raise the money[12] to adequately compensate Coughlins for not allowing them to obtain rulings from the State Court that allow them to repossess the Property and continue to market it. If the Debtor were able to raise the money, why did it not do that early enough to avoid even having to file a bankruptcy case, or at least early enough that it would now have on file a borrowing motion pursuant to § 364 that the creditors and other parties in interest could evaluate on the merits. What the Debtor seeks in reality is the chance to occupy the Property for another six to eight months in order to find another location and then package up and move the 2,000 items, and to do that at Coughlins' expense.

Evidence of further "cause" to modify the stay, were any needed, is ample. The motion to deal with utility deposits pursuant to §366 (doc 47) was filed well outside the twenty days contemplated by §366(b). Not that the late filing prevents Debtor and a utility, such as the water and sewer coop, from reaching an agreement, but the late filing does make it possible for the utility to "alter, refuse or discontinue service" if it

_____

[12] In this connection, the Debtor's refusal to disclose the identity of the person or entity which will lend the funds, resulting in the Coughlins having no opportunity to assess the likelihood of the funds materializing, is particularly brazen.

wishes to.  While this contingency appears to be unlikely, the late filing of the motion suggests either a lack of paying attention to the details of a chapter 11 case, or an unwillingness or inability to commit resources to the problem. Indeed, it seems apparent that the owners and managers of Cultural Assets are committing the bare minimum amount of financial resources needed (in their opinion) to keep the chapter 11 case going.

Debtor's operations manager and primary economic resource – Mr. Luckett – repeatedly demonstrated his lack of credibility and thus his unreliability as the driving force for an honest and successful reorganization.  Part of this was the divergence between his version of events and those of the credible witnesses.

Mr. Luckett's testimony in response to often simple questions consisted of tangled wording that effectively concealed rather than disclosed information.  Further, there were times when he was simply unresponsive.  For example, in response to Mr. Askew's question whether Cultural Assets had hired the Marzullo law firm of Washington, D.C. to work for Cultural Assets[13], Mr. Luckett responded that he could not answer that because they are "dealing with information and the overlap of information".  What

---

[13] The question is important because there is no motion on file to employ that firm, nor evidence of how the firm would be paid.

Case 12-13793-trc11    Doc 58    Filed 12/14/12    Entered 12/14/12 12:07:45 Page 19 of 23

that response is supposed to mean is decidedly unclear,
particularly as an answer to a simple (but legitimate) question
which he ought to be able to answer easily.  He was also asked
whether (in essence) the work he had done on the Harris objects
was work performed by him for his benefit or as a Cultural Assets
representative.  The question was directed to who was entitled to
receive the payments from Mr. Harris.  Mr. Luckett's response was
that he could not answer the question because it was not phrased
in a way that allowed an answer.  (Appropriately, there was no
such objection from Cultural Assets's counsel to the question.)
Mr. Luckett's answer not only avoided responding on what emerged
as a critical issue in the hearing (and will almost certainly be
equally critical in the future in this case), but was also
disingenuous in the avoidance.

And on that critical issue of income of the Debtor, Mr.
Rowe's explanation about whether the Debtor would continue to
assert that it had no income as stated in the  statement of
financial affairs raised an issue of good faith.  As an
accountant Mr. Rowe might well ordinarily make allocations of
income (and expenses) to the various entities and persons,
including Mr. Luckett and Cultural Assets among others, at a much
later time, such as next summer when he does the taxes for
various entities and persons (including some of the owners of the
items) after obtaining an extension of the deadline to file tax

returns.  However, the disclosure requirements of the Code and
the rules, embodied in part in the forms such as the statement of
financial affairs, are clear that Cultural Assets must
affirmatively state at the outset of the case, under oath, what
its income has been.  Thus, the answers in the  statement of
financial affairs and amended  statement of financial affairs
that Cultural Assets had no income of any sort over the last two
years is to be taken as Cultural Assets' representation, made
after careful investigation and under oath, that the assertions
are true and accurate.  The testimony that Cultural Assets might
change its position on that issue depending on an accounting next
summer is completely at odds with the values of transparency,
integrity and accountability that underlie the bankruptcy system.
See Leif Clark, Dicta: Conflicts of Interest, ABI Journal, Vol.
21, No. 3 (April 2002).  Correcting good faith mistakes, as soon
as they are discovered, is one thing; potential accounting
manipulations of assets, numbers and information presented to
creditors under oath is another matter altogether.[14]

Finally, among other arguments, Debtor in effect is arguing
that the balance of harm tips against it, and thus requires that

---

[14] The Court is not suggesting that Mr. Rowe would engage in
the latter activity, though he might be pressured to do so.  The
Court can take judicial notice of the adjudicative fact that Mr.
Rowe is a respected CPA and expert in taxation and accounting,
and further that, while not an habitue of the halls of the
Bankruptcy Court, he is a seasoned participant in bankruptcy
cases and litigation.

Case 12-13793-trc11    Doc 58    Filed 12/14/12    Entered 12/14/12 12:07:45 Page 21 of 23

this Court deny the stay relief, because of the time and difficulty and expense attendant on safeguarding and transporting to a new location, once one is found, of the 2,000 items Debtor is holding for the various owners. Cf. In re Curtis, 40 B.R. 795, 800 (Bankr. D. Utah 1984) ("balance of hurt" as one of twelve factors to consider in deciding whether to modify stay to permit joinder of defendants in state court action). The problem, at least in part, with the argument is that there is no evidence whatever of either an obligation by or right of Cultural Assets to maintain custody or possession of any of the items. It seems apparent that any owner can reclaim any item (that belongs to that owner) at any time, and return it to the Debtor at any time after a move has taken place. Indeed, these circumstances raise the question of why Debtor should be undertaking this expenditure of resources on behalf of the owners to begin with.

**Conclusion**

Coughlins have convincingly met the requirements of both §§ 362(d)(1) and (2) such that they are entitled to stay relief. Indeed, the proof is so strong, and the need for final State Court adjudications so necessary for both Coughlins and Cultural Assets, that it is also appropriate to order that the temporary stay provided by Rule 4001(a)(3) F.R.B.P. will not go into effect when this memorandum opinion and order are entered.

**Order**

IT IS THEREFORE ORDERED that Michael and Kay Coughlins' Emergency Motion for Relief from Automatic Stay (doc 6) is granted, and the Coughlins are permitted to exercise non-bankruptcy law remedies against the debtor in possession Cultural Assets 1, LLC including selling the residence at 21 Painted Horse, Las Campanas, Santa Fe, New Mexico, enforcing the State Court ordered injunctive relief, and returning to the First Judicial District Court, County of Santa Fe, State of New Mexico to pursue the merits of the two State Court actions.

IT IS FURTHER ORDERED that the stay provided by Rule 4001(a)(3) F.R.B.P. will not go into effect when this memorandum opinion and order are entered.

JAMES S. STARZYNSKI
BANKRUPTCY JUDGE

Date Entered on Docket:  December 14, 2012

Copy to:

Jennie D Behles
PO Box 7070
Albuquerque, NM 87194-7070

Alice Nystel Page
Office of U.S. Trustee
PO Box 608
Albuquerque, NM 87103-0608

James A Askew
Arland & Associates, LLC
201 3rd ST NW, STE 505
Albuquerque, NM 87102-3331

Daniel Andrew White
Arland & Associates, LLC
201 Third St. NW Ste 505
Albuquerque, NM 87012